UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN M. SPAHN, IRA, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | **CLASS ACTION** |
| Plaintiff, | ) ) ) | Cause No.: 4:04CV00086 HEA |
| vs. | ) ) ) | |
| EDWARD D. JONES & CO., L.P., THE JONES FINANCIAL COMPANIES, L.L.L.P., EDJ HOLDING COMPANY, INC., JOHN W. BACHMANN, DOUGLAS E. HILL, MICHAEL R. HOLMES, RICHIE L. MALONE, STEVEN NOVIK, DARRYL L. POPE, and ROBERT VIRGIL JR., | ) ) ) ) ) ) ) ) | Consolidated with: 4:04CV00189 CAS 4:04CV00225 DJS 4:04CV00282 DJS 4:04CV00466 HEA 4:04CV00467 HEA |

---

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| RACHEL M. ENRIQUEZ, Custodian for Diego Enriquez under IL/UTMA, On Behalf of Herself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Cause No.: 042-00126-02 |
| EDWARD D. JONES & CO., L.P., THE JONES FINANCIAL COMPANIES, L.L.L.P., and EDJ HOLDING COMPANY, INC., | ) ) ) ) ) | Division 9 |
| Defendants. | ) | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
FINAL APPROVAL OF THE SETTLEMENT AND IN OPPOSITION TO OBJECTIONS**

This Memorandum is submitted on behalf of Defendants Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., EDJ Holding Company, Inc., John W. Bachmann, Michael R. Holmes, Richie L. Malone, Steven Novik, Darryl L. Pope, and Robert Virgil Jr. (collectively "Edward Jones"), by and through their undersigned attorneys, in Support of Final Approval of the Settlement and in Opposition to Objections.

## I.      INTRODUCTION

Edward Jones joins Plaintiffs in asking the Court for final approval of the proposed settlement  that was preliminarily approved by the United States District Court for the Eastern District of Missouri and the Circuit Court for St. Louis City, State of Missouri on December 12, 2006 (the "Settlement").  The Settlement resolves multiple complex class actions that have been pending for almost four years.  During that time, the parties have engaged in extensive discovery, participated in two mediations, and submitted extensive briefing in an effort to resolve this litigation.  As a result, the Settlement represents a hard-fought compromise that is endorsed by both Plaintiffs and Edward Jones.

In their concurrently submitted brief, Plaintiffs show that the Settlement satisfies all of the necessary criteria for final approval.  Edward Jones agrees that the Settlement meets these criteria and joins Plaintiffs' request that the Court grant the Settlement final approval.

Although Plaintiffs have adequately addressed the objections filed in this case, Edward Jones is in a unique position to offer additional insight regarding several objections raised with respect to credit vouchers earmarked for current customers, settlement administration, and the Edward D. Jones & Company Foundation.  For the reasons discussed below, these objections lack merit.

2

## II.   THE CREDIT VOUCHERS PROPOSED AS PART OF THIS SETTLEMENT ARE ADEQUATE, REASONABLE, AND FAIR TO THE CLASS.

The current Settlement provides Class Members with one hundred twenty-seven million five hundred thousand dollars ($127,500,000.00) in relief in exchange for the resolution of all claims against Edward Jones. see generally, Stipulation of Settlement of Class Actions ("Stipulation"). Of the $127.5 million offered to Class Members, seventy-two million, five hundred thousand dollars ($72,500,000.00) will be distributed to current customers by way of credit vouchers. Id. at ¶ V.A.33; see also Plan of Allocation, pp. 2-3, 6.[1]

The $72.5 million in credit vouchers will be awarded to approximately 3.5 million current customers on a per capita basis. Plan of Allocation, p. 3; Declaration of Rodney Bahr ("Bahr Decl."), ¶ 14. Edward Jones anticipates that each current customer will receive a total of twenty dollars and twenty-three cents ($20.23) in credit vouchers, a third of which may be redeemed each year for a three-year period. Plan of Allocation, pp. 2-3. The credit vouchers may be used to offset fees, charges, or commissions associated with equity, bond and fixed income trades, the opening or maintenance of Individual Retirement Account ("IRA") or CFO accounts, and/or transferring out assets. Plan of Allocation, p. 3-4. Current customers will be provided with redemption numbers and the amount of the credit voucher available for redemption prior to each of the three year-long redemption periods. Id., p. 4. Current customers need only provide their brokers with their redemption numbers prior to or at the time they wish to redeem the credit vouchers. Id., p. 4-5.

---

[1] The remaining fifty-five million dollars ($55,000,00.00) will be paid in cash and will be used, in part, to compensate former customers. Id.

Several objectors have argued that these credit vouchers are somehow inadequate because they are "disfavored" and/or carry restrictions. However, as detailed below, the proposed credit vouchers represent a fair and appropriate portion of the class' recovery in this case and therefore should not be considered an impediment to final approval.

### A.   Credit Vouchers are Not Fundamentally Unfair.

The basic complaint regarding the proposed credit vouchers is that it is fundamentally unfair to provide Class Members with anything other than cash. In support of this argument, the objectors all cite the same source – an article published by New York State Judge Thomas Dickerson and his law clerk. However, as Judge Dickerson himself points out, "there are occasions when a non-cash settlement of coupons for the purchase of goods or services from the defendant is appropriate and necessary." In line with this proposition, voucher and coupon settlements have been deemed adequate and fair by and approved by numerous federal courts. see, e.g., State of New York et al. v. Nintendo of America, Inc., 775 F. Supp. 676 (S.D.N.Y. 1991)(approving settlement where $5.00 coupons toward the purchase of Nintendo games given to purchasers of Nintendo game systems); In re: Cuisinart Food Processor Antitrust Litig., 1983 WL 153 (D. Conn. 1983)(approving settlement where class members given coupons for up to 50% of Cuisinart products costing $200.00 or less) (citing In re: Alcoholic Beverages Antitrust Litig., No. CV-81-0092 (E.D.N.Y. Nov. 10, 1982); C.G. Dairies Inc. v. Wholesale Tobacco Distributors of New York, Inc., No. 77 Civ. 841 (S.D.N.Y. Jan. 12, 1982); In re Southern Florida Building Supplies Cases, Nos. 77-463-Civ.-NCR et al. (S.D. Fla. Feb. 17, 1980); In re: Montgomery County Real Estate Antitrust Litig., 83 F.R.D. 305, 311-313 (D. Md. 1979); Ohio Public Interest Campaign v. Fisher Foods, Inc., 546 F. Supp. 1 (N.D. Ohio 1982)); In re: Excess Value Insurance Coverage Litig., No. M-21-84, MDL 1339 (S.D.N.Y. Nov. 2, 2005); Phemister

4

v. Harcourt Brace Jovanovich, Inc., 1984 WL 21981 (N.D. Ill. 1984); Henry v. Sears Roebuck
and Co., 1999 WL 334960680, at * 9 (N.D. Ill. 1999) (noting that courts have "consistently
recognized coupons as valid currency in class action settlements").

     In other words, the inclusion of credit vouchers as part of the class' recovery is not
intrinsically undesirable or inappropriate as some of the objectors assert. Indeed, credit
vouchers afforded the class in this case a larger recovery than it otherwise might have gotten at
trial or through an all-cash settlement. Plaintiffs themselves have acknowledged that they "face
substantial risks in prosecuting the Class Actions" due to recent court decisions and serious
defenses raised by Edward Jones. (see Mem. of Law in Support of Lead Plaintiffs' Am. Mot. for
an Order Preliminarily Approving Class Action Settlement, Conditionally Certifying the
Settlement Class, Approving the Form and Manner of Notice, and Setting Fairness Hearing
(Doc. 187), at p. 31.)   Moreover, Edward Jones repeatedly indicated to Plaintiffs throughout the
parties' settlement negotiations that, considering the strength of its defenses, it would not be
agreeable to an all-cash settlement of the magnitude offered to the class in this case. Therefore,
credit vouchers are not fundamentally unfair because they allow the class to receive a greater
settlement than they might otherwise have achieved.

     **B.**    **The Credit Vouchers Provide Real Value to the Class.**

     Some objectors assert that the credit vouchers provide no value to the class. (see, e.g.,
Kern and Slomovitz Objection, at p. 3.) In fact, credit vouchers are valuable because they may
be used to offset the cost of a wide array of Edward Jones products and services purchased by
current customers.

     For example, credit vouchers may be used to reduce the annual forty dollar ($40.00) fee
collected on Individual Retirement Accounts ("IRA"s). see Plan of Allocation, p. 4; Bahr Decl.,

¶ 15.  Such accounts, which generated approximately eighty-six million dollars ($86,000,000.00) in revenue for Edward Jones in 2006, are popular among Edward Jones customers, including Class Members. see Edward Jones 2006 Form 10-K, at 25.  Moreover, in the last twelve (12) months, Edward Jones customers, including many Class Members, executed approximately 6.1 million equity or fixed income trades, for which they paid over three hundred and twenty million dollars ($320,000,000.00) in commissions.  Bahr Decl., ¶ 16; Edward Jones 2006 Form 10-K. Should eligible Class Members wish to continue (or begin) trading equities and/or fixed income products, they may readily reduce the costs of commissions thereon through the use of their credit vouchers.  Plan of Allocation, p. 4.  Furthermore, although it has been insinuated that the Settlement is unfair because current customers must remain Edward Jones customers to use their vouchers, even those current customers who opt to leave the firm may apply credit vouchers toward the fifty dollar ($50.00) fee charged for transferring out assets.  Plan of Allocation, p. 4; Bahr Decl., ¶ 17.

In sum, credit vouchers may be used in a variety of ways by current customers -- whether in continuing to trade with Edward Jones or opting to leave the firm.  As a result, it cannot be argued that the credit vouchers are valueless or that they render the Settlement unfair.

## C.     The Restrictions Imposed on the Credit Vouchers in this Action are Permitted Under Federal Law and Appropriate Under the Circumstances.

Several objectors also argue that the Settlement is unacceptable because the credit vouchers offered to current customers carry certain use restrictions.  (see, e.g., Kern and Slomovitz Objection, at p. 3; Diederich, Hill, and Bowser Objection, at pp. 8-10.)  Use restrictions, however, do not render the credit vouchers unfair, inadequate, or unreasonable.

Indeed, federal courts have approved numerous settlements that include restricted vouchers.  For example, in Cuisinart, class members alleged that defendants violated federal

6

antitrust laws by fixing and maintaining the retail prices of Cuisinart food processors. The parties later entered into a coupon settlement that was approved by the court. As part of that settlement, class members could use their coupons to purchase any single item appearing on a product list submitted by Cuisinart, with the exception of food processors or times with a list price exceeding $200.00 at 50 percent of the suggested retail price of the item in effect at the time of the issuance of the coupons. Id. at *2. Alternatively, more than one item could be purchased at a 50 percent discount so long as the total discounts for all purchased items did not exceed the aggregate $20.00. Id. Likewise, in Ohio Public Interest Campaign, the court approved a settlement in which class members were given $1.00 coupons that could only be used at a rate of two coupons in each of ten consecutive six-month periods following their distribution. Ohio Public Interest Campaign, 546 F. Supp. at 5.

The restrictions on the credit vouchers in this case are not only comparable to those approved in other settlements, but logical under the circumstances. For example, some objectors have argued that they should be permitted to apply credit vouchers toward the purchase of mutual funds. (Kern and Slomovitz Objection, at p. 3). This restriction is comparable to that in Cuisinart where food processors (the subject of the litigation therein) were excluded from the pool of items to which settlement vouchers could be applied. However, unlike in Cuisinart, the exclusion of mutual funds from the coupon redemption program is mandated by federal law in the current action. Edward Jones is prohibited under Section 22(d) of the Investment Company Act of 1940 from discounting mutual funds, which the acceptance of credit vouchers for such products would entail. see 15 U.S.C. § 88a-22(d) (prohibiting sale of such products "except at

7

current public offering price described in the prospectus).[2]  For this reason, Edward Jones was

forced to exclude mutual funds from the voucher program.

 Some Class Members have also objected that current customers cannot aggregate their

credit vouchers and credit vouchers cannot be applied to items costing $10.00 or less. (Kern and

Slomovitz Objection, at p. 3) What the objectors ignore is that the payment allocation arrived at

by the parties is the result of hard-fought negotiations between competent counsel and genuine

economic concerns that have enabled the class to receive more relief than it would have absent

such restrictions.  As stated by the court in Bowling v. Pfizer, Inc., 143 F.R.D. 141, 169 (S.D.

Ohio 1992):

> While it might be advantageous to the class to have certain features added to the
> proposed settlement…[a]…proposed settlement is just that, a settlement. It is not a wish-
> list of class members that the Defendants must fulfill. A settlement should be the end
> result of negotiation between two parties with conflicting interests. While the proposed
> settlement might be improved for the class with certain additions, in examining the
> proposed settlement as a whole, the proposed settlement does not become unfair" because
> class members do not receive everything they might have desired.

Id. at 169; see also Thompson v. Met. Life Ins. Co., 216 F.R.D. 55, 65 (S.D.N.Y. 2003).  Here,

Class Counsel has taken into account the risks involved in pressing forward with the class'

claims and concluded that, in the face of such risks, the recovery allotted to Class Members,

including the distribution of credit vouchers with price and timing restrictions, is fair, reasonable,

and adequate.  As such, the Court should disregard these objections and grant final approval to

the Settlement.

---

[2] Moreover, Kern and Slomovitz's objection that they only own mutual funds and therefore the
settlement is inadequate because credits cannot be applied toward purchasing such funds is
misplaced.  (See Kern and Slomovitz Objection, at p. 3.) The mere fact that some individuals
may prefer to buy mutual funds over other products does not render the settlement inadequate as
to the entire Class. see, e.g., Henry, 1999 WL 33406080, at 7 (noting that the fact that a few
individuals may no longer want to shop at Sears and thereby use coupons issued as part of a class
action settlement did not render the Settlement inadequate as to the entire class).

### D.    The Process for Redeeming Credit Vouchers is Not "Onerous."

Some objectors also argue that the Settlement is unfair because the process for redeeming

credit vouchers is "unnecessarily burdensome and restrictive." (Diederich, Hill, and Bowser

Objection, at p.2.)  These objectors complain that the rules for redeeming credit vouchers are

confusing and that the process for redeeming them is "onerous and requires constant

involvement by Class Members to avoid losing relief." (Id. at p. 9.)  In reality, the process for

obtaining credit vouchers is quite simple.

As detailed in the Plan of Allocation, eligible Class Members will receive a redemption

number by mail prior to each of the three redemption periods provided for by the Settlement.  see

Plan of Allocation, p. 4.  Although Class Members will be required to notify their broker of their

intent to apply a voucher to a fee or service prior to or at the time of the relevant transaction, in

practicality, Class Members will not need to know or produce their voucher number in order to

take advantage of the voucher program.  Bahr Decl., ¶ 18.  In this regard, brokers will have the

ability to look up a Class Member's redemption number and apply it electronically to any

eligible transaction.  Id. Thus, Class Members are only responsible for knowing to inquire about

the use of a voucher; Edward Jones will take care of the rest.

### E.    Current Customers' Receipt of Credit Vouchers in Lieu of Cash Does Not
### Render the Settlement Unfair.

Some objectors also argue that the Settlement is unfair because current customers cannot

opt to receive cash in lieu of credit vouchers. (see Laye and Stokes Objection, at pp. 2, 5;

Diederich, Hill, and Bowser Objection, at p. 8; Yancey and Goodman Objection, at p. 2.)

However, Class Members' preference for cash is an insufficient basis for denying a voucher or

coupon settlement under federal law. see, e.g., Cuisinart, 1983 WL 183, at *7; Ohio Public

Interest Campaign, 546 F. Supp. at 11; Henry, 1999 WL 334960680, at * 6.  As pointed out by

9

the Court in Henry, *"[t]he question is not what the objectors would have preferred to receive, but whether the Settlement that was negotiated by class counsel is fair, reasonable, and adequate."* Henry, 1999 WL 334960680, at * 6.  As a result, the Court should reject this objection and grant final approval to the Settlement.

Moreover, it is worth noting that the credit vouchers received by current customers supplement monetary and non-monetary benefits already received by Class Members pursuant to separate settlements between Edward Jones and federal regulators in December 2004.  These settlements resulted in the establishment of a Fair Fund and the distribution of $79 Million in cash to individuals who purchased Preferred Funds between January 1, 1999 and December 31, 2004.  They also resulted in the establishment of a "Free Switch" program.  As part of the Free Switch program, only current customers, not former customers, who owned Preferred Funds on December 31, 2004 and continued to own such Funds as of August 19, 2005, were permitted to move their assets in those Funds to any other mutual fund Edward Jones offered without being charged a commission.  Therefore, as a practical matter, assuming the Settlement is finally approved, most Class Members who are current Edward Jones customers will have received a Fair Fund payment, a Free Switch opportunity, and either credit vouchers or an additional cash payment.  Thus, the suggestion that current customers have been unfairly treated because they are to receive credit vouchers is entirely misplaced, and should not block final approval.

### F.    The Plan of Allocation Established in this Litigation has a Reasonable, Rational Basis and is Therefore Adequate Under Federal Law.

Objectors also assert the Settlement is unfair because Class Members will receive per capita rather than pro rata settlement payments. (Laye and Stokes Objection, at p. 4).  Specifically, they complain that Class Members will receive disproportionate rights and benefits relative to the amount of damages they have sustained (Laye and Stokes Objection, at p. 4).

10

This objection, which neither addresses practical reasons for a per capita distribution nor the overall environment under which the Settlement was negotiated does not render the Settlement unfair, unreasonable, or inadequate, and therefore should not impede the Settlement's approval.

Under federal law, it is well-established that a plan of allocation need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel. In re Charter Communications, Inc., 2005 U.S. Dist. LEXIS 14772, at *5 (E.D. Mo. 2005) (citing In re American Bank Note Holographics, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001)); see also White v. National Football League, 822 F. Supp. 1389, 1420-1424 (D. Minn. 1993), aff'd 41 F.3d 402 (8th Cir. 1994); In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. 2007); Taft v. Ackermans, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. 2007); Hicks v. Morgan Stanley & Co., 2005 U.S. Dist. LEXIS 24890, at * 19-*20 (S.D.N.Y. 2005); Thompson v. Met. Life Ins. Co., 216 F.R.D. 55, 65 (S.D.N.Y. 2003); In re NASDAQ Market-Makers Antitrust Litig., 2000 U.S. Dist. LEXIS 304, at *5 (S.D.N.Y. 2000).

The allocation here has been planned on a per capita basis rather than pro-rata. Practically, this is required to ensure that the credit vouchers are in denominations that can actually be used. If the credit vouchers are issued on a per capita basis, some Class Members with larger purchases or holdings during the Class Period would receive hundreds of dollars in credit vouchers while others received credit vouchers worth only a few cents. As the parties agreed to a three year redemption period, those Class Members who had large amounts of credit vouchers would have been hard pressed to use all of them. Conversely, those Class Members who only received a *de minimis* amount of credit vouchers would have little incentive to redeem them at all. Thus, contrary to the assertions of the objectors, it made practical sense

to spread the value of the credit vouchers evenly over the whole base of current customer Class Members to ensure that more of them were redeemed.  Indeed, if Edward Jones wanted to devalue the Settlement, it would have insisted on a pro-rata distribution.

Moreover, both the Purchaser Settlement Class and the Holder Settlement Class received a distribution of cash from the $79 million Fair Fund as a result of Edward Jones' settlement with the federal regulators.  This distribution was done on a pro-rata basis which took into account both the amount of revenue sharing attributable to a particular preferred fund and the size of the customer's holdings.  In addition, current customers were permitted a "Free Switch" from a preferred fund to any other mutual fund product sold by Edward Jones.  On its own, the allocation of the Settlement on a per capita basis is reasonable and has a rationale basis for being implemented.  Viewed in the context of all benefits received by Class Members, it is beyond reproach.

### III.    CY PRES DISTRIBUTION TO THE EDWARD D. JONES & COMPANY FOUNDATION IS FAIR, REASONABLE, AND ADEQUATE.

Some objectors also oppose the donation of unclaimed settlement funds to the Edward D. Jones & Company Foundation.  (Kern and Slomovitz Objection, at p. 10.)  In this regard, they have complained that (1) they are unaware of the Foundation's goals; and (2) they fear that Edward Jones will claim that it gave Settlement money to charity when in fact such money does not belong to Edward Jones. (Id.)  Instead, these objectors argue, unclaimed funds should be given to an investor education organization or a securities-related charitable group.  (Id.)

This proposed reallocation of Settlement funds is inappropriate under federal law.  While it is clear that a Court may direct the *cy pres* disposition of unclaimed settlement funds where the settlement agreement is ***silent*** about the distribution of such funds, such is not the case where the parties' agreement affirmatively requires that funds remaining after distribution to the class go to

a particular source. <u>see, e.g.</u>, 4 Newberg on Class Actions § 11:20 (4th ed.) ("When the settlement agreement is **silent** about the disposition of undistributed class recovery funds, **then in the absence of subsequent agreement of the parties**, the court having jurisdiction over the fund may make an appropriate order for the disposition of such funds.")(emphasis added).  In this respect, the United States Supreme Court has recognized that "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." <u>Evans v. Jeff D.</u>, 475 U.S. 717, 726, 89 L. Ed. 2d 747, 106 S. Ct. 1531 (1986).

Simply put, the portion of the parties' agreement that permits funds to be distributed to the Foundation is just that – part of the parties' agreement.  As a result, it is not the Court's duty to modify this portion of the agreement, but to evaluate whether the agreement, including this provision, is fair, reasonable and adequate.

The Foundation's receipt of funds in this litigation does not render the Settlement unfair, unreasonable, or inadequate for the class.  In fact, the proposed donation will benefit the class because the Foundation gives to charities and organizations whose work affects the lives of all involved.  By way of background, the Foundation was formed more than two decades ago in order to support and reinforce Edward Jones' commitment to "giving back" to the communities to which it is a part. <u>see</u> Declaration of Mary Berry ("Berry Decl."), ¶ 3. The Foundation's goal is to provide reliable financial and human resource support for the betterment of these communities and of mankind. <u>Id.</u>, ¶ 4.  In recognition of the Firm's deep Midwestern roots, a substantial portion of the Foundation's charitable giving supports St. Louis institutions and

13

organizations. Id., ¶ 5. However, the Foundation has made contributions to worthy causes outside the Midwest as well. Id.

Between January 1, 2001 and July 31, 2007, the Foundation has contributed to 1,052 organizations ranging from the American Red Cross to the YMCA. Id., ¶ 6. A full list of recipients is attached to the Berry Declaration as Exhibit 1. Based on this list, it is clear that Class Members, whose lives are undoubtedly touched by one or more of the broad range of causes to which the Foundation donates, would benefit from contributions made by the Foundation as part of the Settlement. As a result, the Court should honor the parties' agreement and permit the Foundation to receive and distribute unclaimed Settlement funds in this litigation.

## IV.     EDWARD JONES HAS AND WILL PROPERLY ADMINISTER THE SETTLEMENT.

Some objectors have also asked the Court to continue to monitor the Settlement after its approval and to "stagger" payments to the "Claims Administrator" to "show the Class, the Court, and the public that the Agreement is being administered properly, correctly, and completely." (Diederich, Hill, and Bowser Objection, at p. 18-20.) These requests have no merit and should be disregarded by the Court.

As the Court is no doubt aware, Edward Jones has served as the "Claims Administrator" in this case. As part of that role, Edward Jones has:

(1) generated a Class Notice mailing list based on the firm's customer database;

(2) mailed Class Notices to Class Members;

(3) collected and counted opt-outs and objections;

(4) established a protocol to deal with change of address requests and undeliverable mail;

(5) conducted internal audits to ensure that the Notice and Claims Process was running smoothly;

14

(6) caused notice regarding the Settlement to be published on Businesswire.com, a

widely-circulated wire service, on April 13, 20, and 27, 2007;

(7) established a toll-free telephone number with a recorded message that informed Class

Members how to obtain copies of the Class Notice as approved by the Court, as well as

the Settlement Stipulation, and/or the Plan of Allocation; and

(8) established on its website a means by which Class Members could download the

Class Notice approved by the Court, the Settlement Stipulation and/or the Plan of

Allocation.

Bahr Decl., ¶¶ 3-13.

However, unlike a third-party administrator who would have undoubtedly deducted its

fees prior to distributing money to Class Members, Edward Jones does not stand to recover any

money for its efforts unless and until all payments have been made to Class Members. see Plan

of Allocation; Amendment to Stipulation of Settlement of Class Actions (effective July 1, 2007).

As a result, the suggestion that the Court stagger payments to Edward Jones or that Edward

Jones has some vested interest in preventing Class Members from receiving settlement payments

is completely misplaced.

Moreover, there is no need for ongoing Court monitoring or performance reports because

adequate safeguards already exist to catch any problems that might arise with respect to the

distribution of Settlement funds. The parties have already stipulated that the Court "shall retain

jurisdiction with respect to the implementation and enforcement of the terms of the Stipulation."

Stipulation, ¶ V.Q.15. As a result, should any problems occur, objectors, other Class Members,

and Class Counsel – who will undoubtedly be monitoring the Settlement's progress - will have

the ability to bring such problems to the Court's attention.   Moreover, Edward Jones has made a

commitment to monitor itself and to inform the Court and other parties of any problems that

arise. This commitment is evidenced by Edward Jones' handling of the problems which arose

with respect to the sending of Class Notices in this litigation. When Edward Jones discovered

that some Class Members did not receive Notice due to a computer programming error, it

promptly notified the Court and the other parties and helped resolve the issue.[3]

In sum, there is no reason to doubt that the Settlement will continue to be administered

fairly or to be adequately monitored by the parties involved. As a result, the Court should reject

this objection and finally approve the Settlement.

### V.   CLASS MEMBERS WHO CHOOSE NOT TO OPT-OUT OF THE SETTLEMENT MAY FAIRLY BE ENJOINED FROM MAINTAINING INDEPENDENT ACTIONS ADDRESSING THE SAME ALLEGED HARM.

Finally, Objectors Kern and Slomovitz have lodged the curious complaint that the

Settlement is unfair because it provides that Class Members who do not affirmatively opt out of

the Settlement be preliminarily and permanently enjoined from bringing or continuing actions

instituted on or after November 20, 2006 (including arbitrations) that assert claims released by

and through the Settlement. (Kern and Slomovitz Objection, at p. 11.)

However, enjoining subsequent or concurrent lawsuits by Class Members who chose not

to opt-out is perfectly appropriate and fair in this litigation and should not serve as a bar to final

approval. Federal courts have repeatedly held that so long as Class Members receive (1) the

"best notice practicable under the circumstances"; and (2) the opportunity to opt-out in

conjunction with a class action settlement, they may properly be enjoined from bringing

independent lawsuits which allege claims released by and through that settlement. see, e.g.,

---

[3] It is also worth noting that Edward Jones was trusted by the Securities and Exchange Commission to distribute Fair Fund payments to the same individuals who comprise the classes in this case.

Thompson v. Edward D. Jones & Co., 992 F. 2d 187 (8th Cir. 1993)(holding that subsequent lawsuit by class member who did not opt out after notice was properly enjoined by district court); Berardinelli v. Gen. Am. Life Ins. Co., 357 F. 3d 800 (8th Cir. 2004) (affirming injunction barring subsequent lawsuit by class member where class member received proper notice, could have opted out, and chose not to do so).

Here, Class Members have been given the opportunity to opt-out of the Settlement. Stipulation, ¶ V.I. In addition, Class Members have received the best notice practicable under federal law – individualized notice by mail to their last known address. Stipulation, ¶ V.F.4; Bahr Decl., ¶¶ 5, 8; Grunin, 513 F. 2d at 121 (individualized notice by mail to the last known address is the "best notice practicable" in a class action contest). Edward Jones has also provided supplemental notice to the class by publication in a widely circulated wire service and on Edward Jones' website, and through the establishment of a toll-free telephone number with a recorded message that informed Class Members how to obtain copies of the Class Notice as approved by the Court, as well as the Stipulation. Bahr Decl., ¶¶ 11-13. As a result, the Court should disregard Kern and Slomovitz's suggestion that the injunction provision incorporated into the Settlement is unfair to Class Members.

Kern and Slomovitz attempt to bolster their objection by arguing that (1) "Each person should be given the opportunity to bring his or her own action if he feels that the offered $17.99 is inadequate or that $10/year voucher is of little use"; (2) "most Class Members were not aware of the scheme until after they received the Notice in the mail" and/or did not read the Class Notice, including the injunction provision, once it was received;" and (3) no real harm will come to Defendants if the actions continue even without the Class Member affirmatively opting-out of this Settlement.

None of Kern and Slomovitz's arguments alter the fact that the Court may properly enjoin those Class Members who have chosen to take part in and benefit from the Settlement from independently continuing or bringing substantially similar claims that are barred by the Settlement. First, as indicated above, all Class Members have been given the opportunity to bring a separate suit if they feel the consideration offered by the Settlement is inadequate. This opportunity, which is part and parcel of the Class Action mechanism, was afforded to Class Members when they were given the option to opt-out or exclude themselves from the Settlement. Indeed, the Class Notice itself not only explicitly informs Class Members of their right to opt-out, but makes clear that failure to opt-out will preclude them from bringing or continuing independent actions:

> **13. If I do not exclude myself, can I sue Defendants and the other Defendants' Released Persons for the same thing later?** No. Unless you exclude yourself, you give up any rights to sue Defendants and the other Defendants' Released Persons for any and all Released Plaintiffs' Claims. If you have a pending lawsuit, speak to your lawyer in that case immediately. You must exclude yourself from this Class to continue your own lawsuit. The exclusion deadline is June 11, 2007.

(Class Notice, at p.4).[4]

Second, though irrelevant to the current analysis, it is highly unlikely that most Class Members were unaware of revenue sharing prior to receiving Notice in June (or August) of 2007. Edward Jones' revenue sharing practices were first publicly examined in a Wall Street Journal Article published on January 9, 2004. That article, it is believed, spurred the lawsuits that are the subject of the Settlement, and was certainly public enough to put Class Members on notice. Moreover, as the result of Edward Jones' federal regulatory settlements, Class Members received constructive if not actual notice of Edward Jones' revenue sharing practices beginning in January

---

[4] The Class Notice sent to certain omitted Class Members on August 8, 2007 also included this provision, although the opt-out date provided therein was adjusted to September 25, 2007.

2005. This disclosure process began with web disclosures on Edward Jones' website on January 14, 2005, letters to existing customers on February 18, 2005, and point of sale disclosures (implemented as of February 18, 2005).  In addition, most Class Members received notice by and through the implementation of the Free Switch program in the Summer of 2005 and the distribution of Fair Fund payments in April of 2007.

The Court should also disregard Kern and Slomovitz's argument that the Settlement's injunction provision is unfair because some Class Members may not have read the Class Notices they received.  Once again, future claims may be enjoined so long as the best notice practicable has been provided and the opportunity to opt-out exists. The objectors have cited no authority to support the notion that failing to read a Class Notice once it has been received changes this analysis.

Finally, the notion that "no real harm will come" to Edward Jones if Class Members are permitted to proceed with individual actions without affirmatively opting out is unrealistic at best.  Aside from being forced to incur the litigation costs associated with fighting independent actions, Edward Jones would be deprived of the benefit of its bargain in settling this litigation if Class Members were permitted both to participate in the Settlement and to pursue independent claims against Edward Jones. "The binding effect of the judgment on all class members who do not exclude themselves is of major importance in the settlement context. A classwide judgment represents one of the major incentives that lead defendants to settle" a class action. 4 Newberg on Class Actions § 12:14 (4th ed.).

Here, Edward Jones has agreed to pay Class Members $127.5 million in exchange for a release of claims. This exchange and the binding effect of the release on those Class Members who have not opted out was of major importance to Edward Jones in negotiating the Settlement

19

and constitutes a material term thereof. Allowing Class Members to have their cake and eat it
too (i.e. both receive Settlement payments and avoid the release that was intended to serve as a
condition precedent to such payments) would leave Edward Jones exposed to potential liability
that the Settlement was meant to avoid, and, in effect, eliminate the consideration offered by the
class in support of the parties' agreement. As a result, the Court should reject Kern and
Slomovitz's objection and grant the Settlement final approval.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' concurrently filed papers,
Edward Jones respectfully asks the Court to finally approve the Settlement.

20

Dated: October 9, 2007

GREENSFELDER, HEMKER & GALE, P.C.

By_____/s/ David M. Harris_____
    David M. Harris, # 3327
    James H. Ferrick III, # 77830
    David P. Niemeier, # 497950
    10 S. Broadway, Suite 2000
    St. Louis, MO  63102
    Telephone:  (314) 241-9090
    Facsimile:  (314) 345-5465

*Attorneys for Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., EDJ Holding Company, Inc., John W. Bachmann, Michael R. Holmes, Richie L. Malone, Steven Novik, Darryl L. Pope, and Robert Virgil Jr.*

## CERTIFICATE OF SERVICE

I certify that on October 9, 2007, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.  I also certify that the individuals listed in the attached service list will be sent copies of the foregoing by First Class Mail, postage prepaid, on or about October 10, 2007.

_____/s/ David M. Harris_____

## SERVICE LIST

| | | |
|---|---|---|
| Ambrosier, Bradley E.<br>450 Morton<br>Elkhart, KS 67950 | Arvig, Richard<br>22430 Janero Ave. N.<br>Forest Lake, MN 55025 | Averill, Annemarie<br>145 Dry Hill Road<br>Montague, MA 01351 |
| Barnes, Bernadette<br>1935 Mary Catherine St.<br>Ypsilanti, MI 48198 | Behnke, Elizabeth R.<br>5414 Chasewood Dr.<br>Bacliff, TX 77518 | Behnke, Geraldine D.<br>5414 Chasewood Dr.<br>Bacliff, TX 77518 |
| Birkes, Barbara<br>6898 Ross Cole Lane<br>Temple, TX 76502 | Bludau, Owen W.<br>2200 7th Street, Ste 300<br>Bay City, TX 77414 | Boldin, Darlene<br>114 Universal Dr.<br>St. Peters, MO 63376 |
| Borchett, Paul<br>PO Box 539<br>Emory, TX 75440 | Bowser, Alyssa<br>5316 N. Mersington Ave.<br>Kansas City, MO 64119 | Bowser, Colton<br>5316 N. Mersington Ave.<br>Kansas City, MO 64119 |
| Bowser, Janine<br>5316 N. Mersington Ave.<br>Kansas City, MO 64119 | Bowser, Ryan<br>1244 E. 25th Ave<br>North Kansas City, MO<br>64116 | Brown, Gary<br>97 CR 150<br>Breckenridge, TX 76424 |
| Brown, Sharon<br>97 CR 150<br>Breckenridge, TX 76424 | Brumbaugh, Diane<br>462 Harper Street<br>Jesup, GA 31546 | Cater, Brenda<br>214 Hazelwood Dr.<br>Sheridan, AR 72150 |
| Chaffee, Jean M.<br>131 Valencia F.<br>Delray Beach, FL 33446 | Chappel, Charles D.<br>2227 Springdale Drive<br>Newberry, SC 29108 | Chappel, Judy W.<br>2227 Springdale Drive<br>Newberry, SC 29108 |
| Clark, Lois<br>1317 N. Nashua Ter.<br>Inverness, FL 34453 | Clemens, Shirley<br>1751 131st Ave. NW<br>Coon Rapids, MN 55448 | Coats, JD<br>2246 Burwell Dr.<br>St. Louis, MO 63136 |
| Collins, Brian<br>6065 Green Dr.<br>Harsens Island, MI 48028 | Colson, Isaac<br>9139 Hipps Rd.<br>Jacksonville, FL 32222 | Coughlin, Elizabeth W.<br>663 Berger Road<br>Padukah, KY 42003 |
| Davis, James A.<br>1835 East Military, Suite 113<br>Fremont, NE 68025 | Davis, John W.<br>4445 Eastgate Mall, Second<br>Floor<br>San Diego, CA 92121 | Deering, Patricia D.<br>541 Milton Rd. PO Box 762<br>Litchfield, CT 06759 |
| Devine, Rene<br>120 Lynn Ln.<br>Oceanside, CA 92054 | Diederich, Rebecca<br>6775 Flush Road<br>St. George, KS 66535 | Eley, Andrew T.<br>716 O'Toole Dr.<br>Minooka, IL 60447 |
| Eley, Sara L.<br>716 O' Toole Drive<br>Minooka, IL 60447 | Eller, Brenda<br>1495 N. 6th St.<br>David City, NE 68632 | Eller, Gregory<br>1495 N. 6th St.<br>David City, NE 68632 |
| Ellis, Merph<br>177 Stoneway Trail<br>Madison, AL 35758 | Esquibel, Edward<br>PO Box 704<br>Butte, MT 59703 | Ford, Thomas L.<br>6 Turnberry Court<br>Monkton, MD 21111 |
| Fore, Paul M.<br>6310 Sloan Circle<br>Altonna, AL 35952 | Francis, LaVona<br>2905 Princeton Place<br>Manhattan, KS 66503 | French, Barbara A.<br>PO Box 5605<br>Oroville, CA 95966 |

| | | |
|---|---|---|
| Frenn, Anthony M.<br>4548 Coach Lamp Lane<br>Roseville, CA 85747 | Frenn, Batty J.<br>4548 Coach Lamp Lane<br>Roseville, CA 85747 | Garcia, Ramon I.<br>106 N. Washington<br>Roswell, NM 88203 |
| Goodman, Ellen<br>1711 Camden Park Dr. SW<br>Olympia, WA 98512 | Haas, Linda<br>8237 Lapiz Drive<br>San Diego, CA 92126 | Hagen, John F.<br>1328 Lawrence Drive<br>Hays, KS 67601 |
| Hagen, Lillian E.<br>1328 Lawrence Drive<br>Hays, KS 67601 | Hanratty, Michael<br>2725 Natchez Place<br>Colorado Springs, CO 80919 | Hanson, Daniel F.<br>6252 McPherson Ave.<br>St. Louis, MO 63130 |
| Harris, Kenneth D.<br>1521 Wells St.<br>Port Huron, MI 48060 | Harris, Stephen<br>382 Cayman Loop<br>Pawleys Island, SC 29585 | Hill, Mark<br>7612 NE 127th St.<br>Kansas City, MO 64167 |
| Hoffmann, Craig M.<br>876 Scenic Road<br>Hubertus, WI 53033 | Ingram, Jeff C.<br>2751 West River Dr. #1421<br>Sacramento, CA 95833 | Johnson, Dorothy<br>PO Box 1624<br>Gainesville, GA 30503 |
| Jones, Dianna<br>900 Bayou Ave. 150<br>Minden, LA 71055 | Jones, Sue M.<br>PO Box 151, East Maple<br>Street<br>Morrison, TN 37357 | Kelb, Robert J.<br>135 S. Fields Cir.<br>Chapel Hill, NC 27516 |
| Kirby, Rhonda A.<br>811 Berkley Drive<br>Wabash, IN 46992 | Kreilein, Robert L.<br>205 Fairview Drive<br>Campbellsville, KY 42718 | Leach, Judith<br>1803 Vine St.<br>Midland, MI 48642 |
| Levin, Catharine P.<br>2443 Walnut Grove Ave.<br>San Jose, CA 95128 | Lewis, Scott D.<br>11509 Erwin Ridge Ave.<br>Charlotte, NC 28213 | Lipp, Jeff<br>11412 Mountain Bay Dr.<br>Riverview, FL 33569 |
| Lloyd, LeAnn<br>27400 Chardon Rd. Apt 521<br>Wickliffe, OH 44092 | Lubeck, Mark<br>4213 Winters St.<br>Las Cruces, NM 88005 | Maples, Carolyn<br>1081 Woodline Cir.<br>Murfreesboro, TN 37128 |
| Maples, Wallace<br>1081 Woodline Cir.<br>Murfreesboro, TN 37128 | Matteson, Sheila A.<br>105 Summer Winds<br>LaPorte, TX 77570 | McKnight Self, M.L.<br>600 Indy Pkwy #4301<br>Plano, TX 75075 |
| Michaels, Carol<br>3212 Monterey Rd.<br>Bloomington, IL 61704 | Michaelson, Denise<br>PO Box 64<br>West Oneonta, NY 13861 | Miller, Bill J.<br>PO Box 2122<br>Lithonia, GA 30058 |
| Mitchell, Willie<br>6714 Park Ave.<br>Texas City, TX 77591 | Muntzel, David E.<br>22980 Hwy. B<br>Sedalia, MO 65301 | Muntzel, Marianne L.<br>22980 Hwy. B<br>Sedalia, MO 65301 |
| Nadler, Richard F.<br>PO Box 81<br>Gray Summit, MO 63039 | Oen, Arlene L.<br>14334 E. 53rd St.<br>Yuma, AZ 85367 | Oen, Arthur E.<br>14334 E. 53rd St.<br>Yuma, AZ 85367 |
| Olsen, Joyce<br>818 Gates Ave.<br>Elk River, MN 55330 | Olsen, Nicholas<br>818 Gates Ave.<br>Elk River, MN 55330 | Olson, James W.<br>6 Harrison<br>Deadwood, SD 57732 |
| Ostroski, Carolyn<br>2449 S. Fairway Drive<br>Pocatello, ID 83201 | Pallie Trust<br>8610 Birdseye Court<br>Linden, NC 28356 | Parker, Kay D.<br>1695 Grandma Branch Rd.<br>Grantville, GA 30220 |

| | | |
|---|---|---|
| Peterson, Travis<br>116 College Pl.<br>Ypsilanti, MI 48197 | Renkert, Ralph<br>10605 Hard Rock Road<br>Austin, TX 78750 | Renshaw, Madeline J.<br>1626 Dagmar Pl.<br>Decatur, IL 62521 |
| Rinauro, Jennifer E.<br>4913 E. Oregon St.<br>Bellingham, WA 98226 | Rogers, William J.<br>83 Huntington Street<br>Lexington, TN 38351 | Schernitzki, Paul T.<br>7850 N. Wade School Rd.<br>Columbia, MO 65202 |
| Schmitz, Rosaline A.<br>2594 W. Parks Rd<br>St. Johns, MI 48879 | Schroeder, Jonathan<br>4 Ridgeland Dr.<br>Stuart, FL 34996 | Seddon, Jenny<br>1944 Hitchvock Ave.<br>Downers Grove, IL 60515 |
| Seevers, Elinor B.<br>5901 Mt. Eagle Dr. Apt. 801<br>Alexandria, VA 22303 | Seevers, Gene F.<br>5901 Mt. Eagle Dr. Apt. 801<br>Alexandria, VA 22303 | Semanko, Gregory<br>23427 735th Ave.<br>Dassel, MN 55325 |
| Smithers, Freda<br>PO Box 306<br>Corbin, KY 40702 | Smithers, Larry<br>PO Box 306<br>Corbin, KY 40702 | Springs, Barney L.<br>903 S. Austin St.<br>Sequin, TX 78156 |
| Stem, LaVon<br>4001 Brentwood Dr.<br>Valparaiso, IN 46283 | Stem, Ronald<br>4001 Brentwood Dr.<br>Valparaiso, IN 46283 | Strinden, William D.<br>116 Christie St.<br>Lufkin, TX 75904 |
| Thompson, Charles M.<br>5615 Canongate Lane<br>Birmingham, AL 35242 | Thompson, Eddie G.<br>703 Cedar Drive<br>Copperas Cove, TX 76522 | Thompson, Jerry D.<br>30 Mill Point Pl.<br>The Woodlands, TX 77380 |
| Thompson, Peggy<br>703 Cedar Drive<br>Copperas Cove, TX 76522 | Thorne, Margaret<br>1515 Aztec Ave. Apt 1<br>Metairie, LA 70005 | Tibbles, Larry L.<br>8601 S.E. 141st Court<br>Portland, OR 97086 |
| Tolbert, Anthony<br>1003 Bayshore Drive<br>Schaumburg, IL 60194 | Trickey, Nelson<br>219 Brenda Lane<br>Columbia, MO 65201 | Van Heuklon, Thomas K.<br>946 Memorial Drive<br>Macomb, IL 61455 |
| Vogel, Bruce E.<br>4501 Sulphor<br>St. Louis, MO 63109 | Waldrop, Patricia<br>5281 Al Hwy 73<br>Bryant, AL 35958 | Weaver, Harold C.<br>100 Norte Vista Dr.<br>Easley, SC 69640 |
| Wilson, Karen W.<br>6224 Harrison Road<br>Platteville, WI 53818 | Wright, Beverley S.<br>8401 Junior Rd.<br>Mobile, AL 36695 | Yancey, Fred<br>1711 Camden Park Dr. SW<br>Olympia, WA 98512 |

993749