UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN M. SPAHN, IRA, on Behalf of Himself and All Others Similarly Situated, | ) ) ) ) | CLASS ACTION<br><br>Cause No. 04:04CV00086 HEA |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Consolidated with: |
| EDWARD D. JONES & CO., L.P., THE JONES FINANCIAL COMPANIES, L.L.L.P., and EDJ HOLDING COMPANY, INC., | ) ) ) ) ) | 4:04CV00118 CAS<br>4:04CV00255 DJS<br>4:04CV00282 DJS<br>4:04CV00466 HEA<br>4:04CV00467 HEA |
| Defendants. | ) | |

## PLAINTIFF COUNSELS' MOTION FOR AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF EXPENSES

## I.     INTRODUCTION

After over three years of hard fought litigation and after extensive arm's-length negotiations between experienced practitioners with the assistance of a highly respected mediator, co-lead counsel have negotiated an outstanding settlement of $127.5 million on behalf of the Class (the "Settlement Fund"). The settlement includes credits for Edward Jones customers of $72,500,000 and cash of $55,000,000.  To compensate them for achieving this exceptional result, co-lead counsel request an award of attorneys' fees and expenses. [1]

As detailed more fully below and in the Joint Declaration of Matthew J. Zevin, Lionel Z. Glancy, and Richard A. Acocelli in Support of the Motions for (1) Final Approval of Class Action Settlement; and (2) Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Decl.") submitted herewith,  Plaintiffs' Counsel conducted extensive pre- and post-filing investigation and discovery; obtained nearly two million pages of documents which they

---

[1] Counsel are submitting fee and cost applications simultaneously in the Circuit Court of the City of St. Louis, State of Missouri, and the U.S. District Court for the Eastern District of Missouri before Judge Autry.  Counsel are not seeking duplicative fees or costs, but rather are seeking the approval of both Courts of counsel's request for fees and costs.  Both applications are scheduled for hearing on the same day, October 18, 2007; the hearing in U.S. District Court is scheduled for 10:00 a.m. and the hearing in the Circuit Court is set for 2:00 p.m..

comprehensively reviewed, coded and analyzed; successfully opposed Defendants' repeated motions and efforts to have Plaintiffs' claims dismissed which involved extensive motion practice at both the trial court and appellate court level; analyzed the damages likely to be proven at trial; consulted with experts; participated in multiple mediations with Michael Geigerman, a highly experienced and respected mediator associated with the United States Mediation Services; resisted renewed efforts by the Defendants to obtain dismissal based upon a recent decision by the United States Supreme Court; and successfully negotiated a very favorable settlement for the Class.

In support of their application, Plaintiffs also submit herewith the declarations of former Missouri Supreme Court Justice, Ronnie L. White and Dr. Scott Hakala. Justice White (retired) opines on the fairness of the fee and Dr. Hakala opines on the substantial value of the settlement. (Attached hereto as Appendix B.)

For the reasons set forth herein and in the Joint Declaration, Plaintiffs' counsel respectfully submit that the requested attorneys' fees – $27 million or approximately twenty-one percent (21%) of the Settlement Fund – are plainly reasonable under the applicable legal standards, and, in light of the significant amount of effort expended, the risk undertaken and the result achieved, should be awarded by the Court.[2]

## II.   SUMMARY OF FACTUAL AND PROCEDURAL HISTORY

The three settled class actions, *Spahn, Enriquez,* and *Bressler,* involve claims against Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., and EDJ Holding Company, Inc. (collectively, "Edward Jones"), and John W. Bachmann, Michael R. Holmes, Richie L. Malone, Steven Novik, Darryl L. Pope, and Robert Virgil Jr. (collectively with Edward Jones, "Defendants"). As described in detail below, these Class Actions arise from Defendants' alleged scheme to shoehorn investors into a limited number of mutual fund families

---

[2] Plaintiffs' counsel are separately submitting to the Court a proposed order with their motions for Final Approval of Class Action Settlement, Final Approval of Plan of Allocation, and Certification of Settlement Class that requests an attorneys' fee award of $27 million and reimbursement of expenses in the amount of $712,000.00.

(the "Preferred Funds Program") in exchange for cash payments Defendants received from those Preferred Funds.[3]  Counsel filed and pursued three actions to recover damages on behalf of Edward Jones customers, based upon complementary but distinct theories and legal standards. *Spahn* focused on Defendants' actions in violation of federal securities law.  *Enriquez* and *Bressler*, in contrast, were based upon Defendants' improper receipt and retention of the cash payments while it held its clients' assets in trust, in violation of Missouri and California state law.

A.      **Background of the Class Actions**

Edward D. Jones & Co., L.P. is a registered broker/dealer that employs investment representatives to sell mutual funds to investors.  As alleged in *Spahn*, the federal action, during the period from 1999 to 2004, Defendants engaged in a deceptive scheme to place investors into what Edward Jones referred to as its "Preferred Funds."  Edward Jones had agreements with the managers of the Preferred Funds that it would receive cash payments based upon the Edward Jones customers who purchased or held the Preferred Funds.  (Edward Jones referred to these payments blandly as "Revenue Sharing" or "Preferred Funds Payments.")  While there were hundreds of mutual fund families available, as a result of these agreements, Edward Jones pushed its clients into the Preferred Funds.  At the same time, Defendants concealed the payments they received for steering customers into the Preferred Funds, as well as the conflicts of interest these payments created for Edward Jones, realizing that if clients learned what was going on it would undermine Edward Jones' ability to sell the Preferred Funds and continue to receive the secret payments.  *Enriquez* and *Bressler,* the actions based on Missouri and California law, allege that Defendants breached their fiduciary duties by receiving and retaining Revenue Sharing from the Preferred Funds it held in trust for its clients.

---

[3] The term "Preferred Funds" refers to the mutual funds in seven fund complexes: Lord Abbett Funds, American Funds, Federated Funds, Goldman Sachs Funds, Hartford Funds, Putnam Funds, and Van Kampen Funds.

### B.    The Spahn Action

*Spahn* is a federal class action originally filed on January 23, 2004, in the United States District Court for the Eastern District of Missouri against Defendants on behalf of all persons, other than the excluded parties, who purchased or otherwise acquired shares, units or other like interest in any of the Preferred Funds through Edwards Jones during the period between January 25, 1999, and January 9, 2004. *Spahn* alleges that, during this period, Defendants marketed shares of Preferred Funds without adequately disclosing to its clients the specifics of the Preferred Funds program (notably that Edward Jones was receiving cash payments from the funds it touted as "Preferred") in violation of Sections 12(a)(2) and 15 of the Securities Act of 1933, Sections 20(a) and 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5 and 10b-10.

The *Spahn* action alleges that instead of offering fair and unbiased recommendations as it promised, Edward Jones gave predetermined biased recommendations, pushing clients into the Preferred Funds in order to reap hundreds of millions of dollars in Revenue Sharing from the mutual fund companies with which it had struck secret deals. Based upon evidence developed during discovery, Plaintiffs believe that, during the *Spahn* Class Period, Defendants received Preferred Fund Payments of approximately $368 million. The *Spahn* complaint also alleges that Defendants misled the members of the class by failing to reveal their material conflict of interest in recommending the Preferred Funds and by concealing their knowledge that the Preferred Funds were diverting enormous sums of money to Defendants to the detriment of the Preferred Funds' profitability.

### C.    The Enriquez Action

Plaintiff Rachel Enriquez ("Enriquez"), as custodian for Diego Enriquez, filed her class action petition ("*Enriquez*") in the Circuit Court of St. Louis City, in the State of Missouri, on January 16, 2004.  Enriquez is an Illinois resident who maintains an investment account at Edward Jones in which she holds shares in mutual funds issued by American Funds, one of the Preferred Funds. *Enriquez* asserts two causes of action based solely on Missouri common law:

breach of fiduciary duty and unjust enrichment.

**D.      The Bressler Action**

Plaintiff Todd Bressler filed his class action complaint ("*Bressler*") in the Los Angeles, County Superior Court, State of California, on January 26, 2004, on behalf of himself, the public, and a class consisting of all current and former clients of Edward Jones who held shares of Preferred Funds. Bressler is a California resident who maintains an investment account at Edward Jones in which he holds shares of Preferred Funds. *Bressler*, like *Enriquez*, asserts state law claims, specifically: breach of fiduciary duties, unjust enrichment, and violation of California Business & Professions Code §17200 et seq. *Bressler* alleged that Defendants collected approximately $300 million in secret Revenue Sharing payments based on their clients' holdings in certain mutual fund families that Defendants promote as its "preferred" list of mutual funds.

**E.      SEC and NASD Enforcement Actions**

Government and industry regulators also investigated Edward Jones' Preferred Funds Program. On December 22, 2004, almost a year after the privately initiated class actions were filed, Edward Jones settled enforcement proceedings with the Securities and Exchange Commission ("SEC"), National Association of Securities Dealers ("NASD"), and the New York Stock Exchange ("NYSE"). Edward Jones agreed to pay $75 million in disgorgement and civil penalties for failing adequately to disclose Revenue Sharing payments received from the Preferred Funds. Defendants agreed to place the $75 million in disgorgement and penalties in a fund (the "Fair Fund").

While government and industry regulators were content to enter into a settlement whereby Edward Jones paid $75 million, and notwithstanding Edward Jones' claim that this settlement represented full recovery for its customers, counsel for plaintiffs in *Spahn*, *Enriquez* and *Bressler* pressed ahead and obtained an additional $127.5 million for the plaintiff classes. This fact alone demonstrates the substantial value created by Plaintiffs' Counsel.

III.   **SUMMARY OF PLAINTIFFS' COUNSELS' EFFORTS**
       **ON BEHALF OF THE CLASS**

Over 28,503 hours of attorney and paralegal time have been expended on these

actions, payment for which has been, from the outset, wholly contingent upon the result

achieved.  Declaration of Keith Johnson submitted herewith, ¶ 4 ("Johnson Decl.").  Prior to

filing their cases in January 2004, Plaintiffs' Counsel devoted substantial effort and resources

conducting pre-filing investigation of the facts and applicable law.  This involved the review of

hundreds of thousands of pages of SEC filings and public records for the Defendants and for the

mutual fund companies who made revenue sharing payments, as well as interviews of numerous

witnesses, and the review, analysis and application of numerous Federal rules and regulations

and Missouri and California state laws.  Joint Decl. at ¶¶ 15-17, 37-41.

Post-filing, Counsel engaged in active litigation that included highly contentious

motion practice.  Counsel for Plaintiffs in the *Enriquez* and *Bressler* actions repeatedly

successfully remanded the state actions after multiple removals by the Defendants.  In this

remand process Plaintiffs' Counsel faced cutting-edge damages/causation issues and constantly

changing law regarding the impact, or lack thereof, of the Securities Litigation Uniform

Standards Act of 1988, 15 U.S.C. § 78bb(f) ("SLUSA").  This litigation, which involved

multiple appellate writs, was spurred in part by a recent decision by the United States Supreme

Court that gave rise to extended and novel jurisdictional arguments.  *Id.* at ¶¶ 25-26, 30, 33-34,

51-51.  The issues raised by the Supreme Court's decision were ultimately decided in Plaintiffs'

favor, but immediately after the Court issued its decision, the potential impact was uncertain and

the favorable outcome was preceded by vigorous and skilled advocacy.  Counsel in *Enriquez*

also defeated Defendants' motion to dismiss and filed a class certification motion, while Counsel

in the *Bressler* action responded to the Defendants' demurrers and motions to strike.

In the *Spahn* action, Plaintiffs' Counsel moved for an order partially lifting the

automatic stay under the Private Securities Litigation Reform Act ("PSLRA"), which the Court

granted, and ordered Defendants to produce documents that they had previously produced in the

*Enriquez* Action to the *Spahn* Plaintiffs.  As a result, Defendants produced almost 2 million

pages of documents to the *Spahn* Plaintiffs. The *Spahn* Plaintiffs, working together with the
State Action Plaintiffs, conducted a detailed review and analysis of the documents produced by
Defendants. The review of these documents assisted greatly in moving the Class Actions toward
ultimate resolution. *Id.* at ¶ 38. Defendants filed a motion to dismiss raising many cutting-edge
issues under the federal securities laws, and Plaintiffs' Counsel researched and fully briefed
those issues. *Id.* at ¶ 39.

      Plaintiffs' Counsel also initiated substantial discovery that included document
requests, interrogatories and discovery to non-party mutual fund companies. *Id.* at ¶¶ 27-28, 42.
Counsel were forced to engage in repeated negotiations concerning discovery and were required
to file motions in order to compel substantive responses from Defendants. *Id.* Counsel also
defended repeated efforts by Defendants to stay proceedings and discovery in all three actions.
*Id.* As a result of their persistence, Plaintiffs' Counsel obtained close to two million pages of
documents from Defendants and non-parties. *Id.* at ¶ 2, 28-29, 38. Plaintiffs' Counsel were
required to pay for the electronic production of the majority of these documents at out-of-pocket
cost. *Id.* Due to the substantial volume of documents involved an outside document
management company was employed to store and make the documents electronically available.
*Id.* at ¶29. While this constituted added expense, it allowed counsel in the different actions, who
are geographically dispersed throughout the country, to maintain, search, code, index and review
the nearly two million documents over a web-based application, promoting considerable
efficiency and eliminating the time and costs of travel.

      As noted above, Plaintiffs' Counsel prosecuted and financed these actions on a
wholly contingent basis and by doing so have shouldered the risk of an unfavorable result for
several years. Counsel advanced out of pocket costs, and bore the risk of perhaps never
recovering, in excess of $738,224.84, and similarly devoted more than 28,504 hours of attorney
and paralegal time. Johnson Decl., ¶¶ 4, 6. The diverse and protracted proceedings have all
been managed as efficiently as possible by Plaintiffs' Counsel, resulting in a settlement that
simultaneously resolves *three* different lawsuits pending in three separate jurisdictions. Indeed,
Plaintiffs' Counsel took extraordinary steps to coordinate discovery, litigation and settlement

negotiations in order to eliminate duplication of efforts and unnecessary expenses, while maximizing their impact.

The various Plaintiffs' Counsel managed their own respective cases, but consistently worked to advance, and potentially resolve, the various cases as efficiently and cooperatively as possible. To that end, counsel for the respective Class Actions shared in the cost and use of the electronic document database to store, search and organize the large volume of documents produced in the three cases. Joint Decl., ¶¶ 29, 53. To the extent permissible, counsel also shared work product and resources and attempted to coordinate case management and strategy. *Id.* Through these streamlined efforts, counsel were able to minimize costs and eliminate duplicity, which inured to the benefit of the settlement class.

Settlement negotiations were no less complicated than the rest of this litigation. Over an almost two year span, Plaintiffs' Counsel in the three actions also engaged in on-again, off-again negotiations with defense counsel to resolve the cases. Plaintiffs' Counsel participated in multiple negotiation sessions in early and mid-2005. Months later, after further motions, the parties met again in the fall and winter of 2005, this time retaining Michael Geigerman to assist in their efforts. *Id.* at ¶¶ 54-58. Further, as a result of complications created by the United States Supreme Court's ruling interpreting SLUSA, Plaintiffs' Counsel participated in additional settlement negotiations in August of 2006 and thereafter. *Id.* at ¶ 60. This work resulted ultimately in the signing of the final settlement agreement in December 2006, which was given preliminary approval by the Court in early 2007.

This $127.5 million settlement is an extraordinary achievement derived from the substantial efforts of Plaintiffs' Counsel, who carefully, aggressively and efficiently litigated this case throughout. For these efforts, Plaintiffs' Counsel request the Court award attorneys' fees of $27 million – approximately 21.2 % of the Settlement Fund – plus reimbursement for the expenses which were necessarily incurred to prosecute the cases.

## IV.   THE LEGAL STANDARD GOVERNING THE AWARD OF ATTORNEYS' FEES

It has long been recognized that "a litigant or a lawyer who recovers a common

fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The purpose of this doctrine is to avoid unjust enrichment and to spread litigation costs proportionately among all the beneficiaries. *Id.* The doctrine is firmly rooted in both Federal and Missouri case law.[4] *See, e.g., Trustees v. Greenough*, 105 U.S. 527 (1882); *Central R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885), *see also Feinberg v. Adolph K. Feinberg Hotel Trust*, 922 S.W. 2d 21, 26 (Mo. Ct. App. 1996) (noting the common fund doctrine was approved by the Missouri Supreme Court in *Jesser v. Mayfair Hotel, Inc.*, 360 S.W.2d 652 (Mo. 1962) where non-litigants were required to "contribute their proportionate part of counsel fees when a litigant successfully created, increased, or preserved a fund in which the non-litigants were entitled to share"), *Lett v. City of St. Louis*, 24 S.W.3d 157, 163 (Mo. Ct. App. 2000) (The common fund "doctrine permits an award of attorney's fees from a common fund when a plaintiff, on behalf of a class, successfully maintains an action that benefits the class members...") *citing Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970).

A.  <u>A Reasonable Percentage of the Fund Created Is the Preferred Approach for Awarding Attorneys' Fees in Common Fund Cases</u>

For their efforts, co-lead counsel are applying for compensation from the Settlement Fund on a percentage basis. The percentage method is the preferred method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class and most fairly correlates counsel's compensation to the benefit conferred on the class.

---

[4] *See, e.g. Byrd v. Chadwick*, 956 S.W.2d 369, 388 (The court's guidance for the future resolution of what reasonable attorneys' fees should be awarded cited cases from the U.S. Supreme Court, the U.S. Court of Appeal for the Ninth Circuit, and various Federal District Courts throughout the country.) In the class action context generally the Missouri Courts have also frequently looked to Federal case law for guidance. *See Ring v. The Metropolitan St. Louis Sewer District*, 41 S.W.3d 487, 490 (2000) ("Missouri Rule 52.08 [governing class actions] is identical to Rule 23 of the Federal Rules of Civil Procedure, therefore, we look to federal precedent for guidance."), *Ralph v. American Family Mutual Ins. Co.*, 809 S.W.2d 173, 174 (1991) (same).

Compensating counsel on a percentage basis makes good sense. First, it is consistent with the practice in the private marketplace where contingent fee attorneys are customarily compensated on a percentage-of-the-recovery method.[5] Second, it rewards efficiency and provides Plaintiffs' Counsel with a strong incentive to effectuate the maximum possible recovery under the circumstances.[6] *See In re Xcel Energy Inc. Securities, Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 993 (D. MN 2005). Indeed, one of the nation's leading scholars in the field of class actions and attorneys' fees, Professor Charles Silver of the University of Texas School of Law, has concluded that among the various methods of compensating counsel, the percentage method is the "only alternative" that is consistent with class members' due process rights. Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809

---

[5] The proper inquiry is what according to the marketplace is the appropriate value of the entire service provided. The judicial task is appropriately focused on:

> "what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character. This was a contingent fee suit that yielded a recovery for the "clients" (the class members) of $45 million. The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client. Suppose a large investor had sued Continental for securities fraud and won $45 million. What would its lawyers have gotten pursuant to their contingent fee contract?"

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). *See also Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, at *40-41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the client. The more the recovery, the more the fee. The percentages agreed on vary, with one-third being particularly common.").

[6]        "The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains. . . . The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours. Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants. . . .

At the same time as it automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure, the contingent fee automatically handles compensation for the uncertainty of litigation."

*Kirchoff v. Flynn*, 786 F.2d 320, 325, 326 (7th Cir. 1986).

(2000). Third, use of the percentage method decreases the burden imposed upon the court by the "lodestar" method and assures that class members do not experience undue delay in receiving their share of the settlement.[7]

**B.    Consideration of Relevant Factors Justify a Fee Award Equal to 21.2% of the Settlement Fund**

In assessing the reasonableness of the percentage fee requested – here approximately 21.2%, or $27 million – courts consider a number of factors, including the results achieved and the time and effort of the attorneys. *Byrd v. Chadwick*, 956 S.W.2d 369, 388 (1997); *see also In re Alcolac, Inc., Litig.*, 945 S.W.2d 459, 461 (Mo. Ct. App. 1997) ("In determining the reasonable value of legal services, the circuit court should consider the time spent, nature and character of services rendered, nature and importance of the subject matter, degree of responsibility imposed on the attorney, value of property or money involved, degree of professional ability required and the result.") Consideration of the various factors discussed below confirms the reasonableness of the fee here requested. See also the Declaration of Ronnie L. White, submitted herewith in Appendix B, attesting to the reasonableness of the award.

**C.    The Result Achieved**

Many courts recognize that the result achieved is a major factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *In re Charter Commc'ns Inc., Sec. Litig.*, MDL Docket No. 1506, 2005 U.S. Dist. LEXIS 14772, at *47 (E.D. Mo. June 30, 2005) ("The results achieved in

---

[7] Professor Coffee argues that a percentage of the gross recovery is the *only* reasonable method of awarding fees in common fund cases:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing. The percentage of the recovery fee award formula is such a "deregulatory" reform because it relies on incentives rather than costly monitoring. Ultimately, this "deregulatory" approach is the only alternative . . . .

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-25 (1986).

light of the risks undertaken is an important factor in computing attorneys' fees award"); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 630 (D. Colo. 1976) ("the amount of the recovery, and end result achieved are of primary importance, for these are the true benefit to the client"); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *see also Byrd v. Chadwick*, 956 S.W. 2d at 388 ("The court should consider...the size of the total recovery on behalf of the class...").

Through diligent pursuit of the claims and skillful negotiation, Plaintiffs' Counsel have created a Settlement Fund of $127.5 million – $55 million in cash and $72.5 million in credits. This is on top of the Fair Fund created pursuant to the settlement of the enforcement actions initiated by government and industry, and is all the more noteworthy for that reason. From the inception of this action, Plaintiffs' Counsel put together an experienced team of lawyers, investigators and experts that are responsible for this noteworthy result. Moreover, given the defenses on liability and damages raised by defendants throughout the litigation, the Settlement Fund may be equal to or more than the Class would have recovered if it had proceeded to trial, as Edward Jones argued both that it had adequately disclosed the Revenue Sharing, and that Plaintiffs suffered no damages as a result of purchasing the Preferred Funds. In a case of this type, "[t]he certainty of fixed recovery by way of agreement is often preferable to the vagaries of what might be achieved by a trial." *Seiffer v. Topsy's Int'l, Inc.*, 70 F.R.D. 622, 629 (D. Kan. 1976). In sum, counsel respectfully submit that the Class could not have gotten better representation and the result achieved reflects that fact.

The Settlement Fund consists of cash of $55 million (already deposited by Edward Jones) and credit vouchers of $72.5 million. The credit vouchers may be used by class members who are current customers of Edward Jones to pay qualifying account maintenance charges, transactions fees charged in connection with the purchase or sale of stocks or bonds, and even to satisfy the "transfer out" fee that Edward Jones charges customers when they close an account. Class members may use one-third of the value of the credit voucher they receive for all such qualifying charges or fees for each of the next three years. In 2006, Edward Jones reported

revenue of approximately $86 million of IRA account and activity fees and another $320 million in trading commission fees. *See* Edward Jones 2006 Form 10-k, a true and correct copy of which is attached to the Johnson Decl. as Exhibit C. Class members who are current customers constitute approximately 60% of Edward Jones' customers.

       Even taking into account that some of the class members who currently are Edward Jones customers may leave Edward Jones over the next three years, and adjusting for the time value of money to reflect the fact the credit vouchers will be utilized over the next three years, the Settlement Fund is valued at over $119 million. *See* Declaration of Scott D. Hakala, Ph.D., CFA attached hereto in Appendix B ("Hakala Decl."). The cash component of the Settlement Fund is $55 million (Edward Jones has already deposited these funds and they are immediately available for distribution). As to the credit voucher, Dr. Hakala has reviewed Edward Jones documents to assess the historical rate of client retention. As revealed by this inquiry, Edward Jones clients are long term holders and Edward Jones has a low rate of termination or transfer of accounts, thus assuring that the vast majority of the class members who are presently Edward Jones customers will remain so during the next three years. As revealed in his declaration, Dr. Hakala demonstrates that class member account turnover per year is very low and that over 95% of the credit voucher will be useable. Hakala Decl., ¶ 8. Dr. Hakala also calculates a time value discount to account for the usability of the credits over three years. He determines that, discounting for the time-value of money, the total present value of utilizable Individual Credit Vouchers is expected to exceed $64.5 million. The adjusted value of the credit vouchers – $64.5 million – combined with the cash component – $55 million – yields a total of $119.5 million. Thus the requested fee – 21.2% of the face amount of the Settlement Fund or $27 million – is only 22.6% of the value of the Settlement Fund adjusted to take account of the likelihood that some class members may choose to leave Edward Jones over the next three years, and the time value of money. Even this adjusted percentage is well within the range of reasonable attorney fees awards which typically are 25%.

       Two of the few class members who have filed objections to the settlement (the "Objectors"), Bowser and Kern, question the value of the settlement, arguing that the

consideration here is comparable to "coupons" discussed in cases they cite. The Objectors are off base in their efforts to devalue the Settlement Fund, and the cases upon which they rely either do not apply, or in fact support the reasonableness of both the settlement and the requested fee. First, and most simply, all of the cases upon which the Objectors rely involve settlements with no cash component whatsoever; the only consideration given consisted of the "coupons." Here, in stark and critical contrast, the Settlement Fund includes a hefty – $55 million – cash component. The cash – the value of which obviously is indisputable – is 43% of the total Settlement Fund. Moreover, the non-cash benefits or "coupons" in the cases cited by Objectors are very different from those to be awarded here. A voucher, the mechanism employed to compensate those members of the class who are current customers of defendants, is a form of bond with a fixed monetary value that may be spent for specific reasons on specific goods; here for qualifying account and transaction fees and charges. In contrast, a coupon is a discount or rebate of a portion of the purchase price of a product or service that is given at the time a product is purchased. The difference is significant. In order to use a coupon, the recipient must buy something which he or she may well not have otherwise elected to purchase, and pay at least a portion of that purchase out of his or her own pocket. Here, class members who are Edward Jones customers and currently paying qualifying account and transaction fees may use the credit vouchers to offset those charges; they do not need to buy a new car or other product to realize the value of the vouchers. Unlike the cases cited by Objectors – perhaps the most noteworthy of which involved a settlement that consisted solely of "coupons" that purportedly were worth $1,000, but to realize this supposed value class members had to buy a new car – class members are not required to buy expensive merchandise or services to utilize the credit vouchers. Class members who already would incur qualifying account maintenance or transaction fees can simply use the credit vouchers to offset those charges. And, by using the voucher to pay fees they would have otherwise incurred, those class members will have extra cash in their pockets they can use for anything they choose.

"Coupon" settlements have also sometimes been criticized as actually benefiting the defendant. Because customers have to buy things that they may not have otherwise

14

purchased, some "coupon" settlements have been challenged as helping the defendant make sales it would not have otherwise made. Redemption of the coupon results in additional sales, and in turn, additional profits that the defendant would not have otherwise obtained (even if the use of the coupon reduces the level of the profit). Here, in contrast, Edward Jones earns no profits from the redemption of the vouchers. The voucher does not provide an additional incentive for current customer class member to buy additional products and does not require any change in their investment habits or strategies. Indeed, vouchers may even be used to offset the "transfer out" fees Edward Jones charges when customers close their accounts. This settlement, and the credit vouchers, are in no way a boon to Edward Jones.

The cases relied on by the Objectors are easily distinguishable and, in large part, support the requested fee. For instance, in *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995), the all-coupon settlement agreement provided for members of the settlement class to receive a $1,000 coupon redeemable toward the purchase of a new GMC truck. Truck owners (many of which were fleet owners who owned as many as 1,000 vehicles) objected to the settlement on various grounds, including that the settlement did nothing to fix the defective trucks at issue in the case; that even with the $1,000 coupon, many owners would be unable to purchase a new truck given their high cost (with list prices from $11,000 to $33,000); and that fleet owners would not be able to redeem all of their certificates by buying new vehicles within the short redemption period (fifteen months). The court concluded that this was simply a "sales promotion for GM" that required class members to spend thousands of dollars for them to derive any benefit at all. *See also Bloyed v. General Motors Corp.*, 881 S.W.2d 422 (Tex. App. 1994) (all-coupon settlement provided $1000 or $500 certificates that could be used in the purchase of a new truck within a 15-month period. In finding the settlement unfair, inadequate and unreasonable, the court found the certificates provided a windfall to the manufacturer by increasing the manufacturer's truck sales at only a slight discount.) The Edward Jones settlement has none of these faults, and certainly is no sales promotion.

Objectors' reliance on *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684 (D. Minn. 1994) is similarly misplaced. In *Buchet*, the all-coupon settlement required defendant

lenders to provide certificates, with a face value of $25, that could be applied to fees charged in obtaining new consumer loans or to refinance existing loans.[8]  In deciding to withhold final approval of the settlement, the court found that the value offered to the class under the terms of the proposed scrip settlement was "simply too tenuous and speculative in nature." *Id.* at 692.  A primary problem was that the plaintiff's own expert acknowledged half of the class would be unable to qualify for new loans because of bad credit histories, and thus "the certificates will be of no value to at least half the class members, regardless of whether they want to use them." *Id.* at 694.  The Objector's expert also opined that "it is likely to cost borrowers more money to take advantage of this incentive." *Id.* at 694-95.  Here, in contrast to the settlement in *Buchet*, almost one-half of the Settlement Fund – $55 million – is in the form of cash.  And even as to the credit vouchers,  no one is required to obtain a new consumer (i.e., high interest rate) loan or refinance an existing loan to utilize the vouchers.  Instead, class members who are satisfied Edward Jones customers who have elected to stay with the brokerage, can use the credit vouchers to offset qualifying account maintenance and transaction charges that they incur and would otherwise have to pay out of their own pocket.  This is a far cry from requiring an aggrieved borrower to borrow more money just to qualify for a benefit.

The other cases cited by Objectors are equally inapposite.  *Maffei v. Alert Cable TV, Inc.*, 316 N.C. 615 (N.C. 1986), concerned the trial court's decision not to certify a class "where the 29-cent relief was worth less than cost of postage and stationery for submitting a claim."  The decision is *not* about approval of a settlement, but a case with de minimis damages. Objectors' reliance on *Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1 (D. Ohio 1982), is surprising since there the court *approved* the settlement, which provided for the issuance of millions of dollars of food purchase certificates, in $1.00 increments, in addition to other relief.  As is the case here, the court found the settlement agreement fair, reasonable, and adequate, and noted the settlement might actually exceed the amount of any damages actually recoverable by plaintiffs could expect to receive from a successful trial.

---

[8] The settlement also provided some alternative forms of scrip, which the court and plaintiffs' counsel and expert deemed *de minimis*. *Id.* at 693.

**D.       The Difficulty and Risks Attendant to the Litigation**

From the outset, Plaintiffs' Counsel faced many risks in pursuing this litigation to a successful conclusion. As detailed above, the resources available to Defendants were fully utilized during the pendency of this dual-jurisdiction litigation, requiring Plaintiffs' Counsel to expend substantial professional and financial resources. In addition, had this settlement not been achieved, Plaintiffs faced additional expensive motion practice, including class certification proceedings, additional fact and expert discovery, a costly jury trial and years of post-trial appeals, with ultimate success far from certain. Numerous cases have recognized that risk is an important factor in determining the fee award. *E.g.*, *Xcel*, 364 F. Supp. 2d at 994; *In re Charter Commc'ns Inc., Sec. Litig.*, MDL Docket No. 1506, 2005 U.S. Dist. LEXIS 14772, at *47-48 (E.D. Mo. June 30, 2005). Uncertainty that an ultimate recovery would be obtained is highly relevant in determining risk. As the court aptly observed in *King Res.*:

> The litigation also involved unique and substantial issues of law in the technical area of SEC Rule 10b-5, . . . difficult, complex and oft-disputed class action questions, and difficult questions regarding computation of damages.
>
> > \*      \*      \*
>
> In evaluating the services rendered in this case, appropriate consideration must be given to the risks assumed by plaintiffs' counsel in undertaking the litigation. The prospects of success were by no means certain at the outset, and indeed, the chances of success were highly speculative and problematical.

420 F. Supp. at 632, 636-37.

At the time of settlement, the substantial risks and uncertainties of continued litigation made it far from certain that an ultimate recovery would be obtained for the Class. Although Plaintiffs believe their claims are strong and negotiated the Settlement on that basis, they also faced substantial risks in prosecuting these cases. The *Enriquez* Plaintiffs faced challenges under SLUSA and recent court decisions interpreting that statute, and the Defendants made serious challenges to the Plaintiffs' Section 10(b) and Rules 10b-5 and 10b-10 claims in the *Spahn* Action.

In all of the actions, the Plaintiffs were faced with the challenging arguments that

the conduct at issue was the standard practice of the entire industry and plausibly condoned by the Securities and Exchange Commission. Further, the damages available if liability issues were decided in the Plaintiffs' favor were far from certain. There is no question that, if not settled, this case would have presented a panoply of sharply contested, difficult and unsettled issues of both fact and law. Moreover, Plaintiffs were not assured that the Class would be certified. An adverse ruling on any of these issues would have been the case's death knell.

The complexity and risks of this action plainly support the fee requested. Plaintiff's counsel have received no compensation during the course of this litigation, and have advanced out-of-pocket expenses of $738,335.85 in prosecuting the case for the benefit of the Class. Any fee award or expense reimbursement to Plaintiffs' Counsel has always been at risk and completely contingent on the result achieved, supporting the requested fee.

### E.   The Quality and Efficiency of the Work

The quality and efficiency of Plaintiffs' Counsel's work on this case was superior and this is evidenced by and reflected in the result. Plaintiff's Counsel put together a convincing case, notwithstanding the barriers created by Defendants, and ultimately persuaded Edward Jones to a settlement fund of $127.5 million on top of the Fair Fund created in settlement of the enforcement actions brought by government and industry regulators. This recovery for the Class is a direct result of effective and cooperative lawyering and the acumen and diligence of co-lead counsel in these actions. Such skill should be rewarded. *See In re Bankamerica Corp. Secs. Litig.,* 228 F. Supp. 2d 1061, 1064 (E.D. Mo. 2002) (noting the experience and ability of the attorneys involves was a factor supporting a percentage award of attorneys fees).

### F.   The Complexity of The Actions' Factual and Legal Questions

Courts recognize that the complexity and difficulty of the issues in a case are significant factors to be considered in making a fee award. *See In re Charter Commc'ns Inc., Sec. Litig.,* MDL Docket No. 1506, 2005 U.S. Dist. LEXIS 14772, at *48-53. The factual issues here required the analysis of almost two million documents, interviews of numerous witnesses and expert analysis of damages. The legal issues were at the cutting edge of securities law,

involving a U.S. Supreme Court decision that was handed down in the midst of already tenuous settlement negotiations. This resulted in another round of motions and appellate proceedings. The issues presented were decisively resolved in Plaintiffs' favor, but they were plainly novel and complex. Had this settlement not been achieved, the factual and legal questions at issue would have been the subject of hundreds of hours of depositions and trial testimony. Numerous difficult issues would be raised in the Plaintiffs' attempts to prove Defendants liable under the applicable legal standards. Given the inherent complexities of these actions, the fee requested is more than fair.

G.   **The Contingent Nature of the Case and the Financial Burden Carried by the Lead Plaintiffs' Counsel**

A determination of a fair fee must include consideration of the contingent nature of the fee and the difficulties which were overcome in obtaining the settlement.

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See* Richard Posner, *Economic Analysis of Law* §21.9, at 534-35 (3d ed. 1986). Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

Plaintiffs' Counsel have received no compensation during the course of this litigation and have borne $738,335.85 in expenses in litigating for the benefit of the Class, and have also spent a substantial amount of time to obtain this result. Any fee award or expense reimbursement to counsel in each of these actions has always been completely contingent on the result achieved and on this Court's exercise of its discretion in making any award.

H.   **A 21.2% Fee Award is Below the Market Rate in Similar Complex Contingent Litigation**

Fees of 21.2% or more have been repeatedly awarded by courts throughout the

country. A fee of this percentage is in line with or even below awards in numerous other similar cases. *See* Appendix A attached hereto.

In addition, the requested fees reflect the private marketplace, a result repeatedly encouraged by the courts. *See Cont'l Ill.*, 962 F.2d at 572. In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients. *See Blum*, 465 U.S. at 903* ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers."); *In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090 E (M), 1990 U.S. Dist. LEXIS 15488, at *22 (S.D. Cal. Aug. 30, 1990) ("In private contingent litigation, fee contracts have traditionally ranged between 30% and 40% of the total recovery."). These percentages are the prevailing market rates throughout the United States for contingent representation.

However, in class action common fund cases such as this, class counsel's attorneys' fees can only be determined by the court in the exercise of its discretion. Here, co-lead counsel request an award of 21.2% or $27 million which is consistent with historic precedent and numerous authorities from courts in this Circuit and throughout the country. An award of the requested fee recognizes the benefits conferred on the Class and the circumstances under which this result was accomplished.[9] It is fair to both counsel and the Class and should be

---

[9] Professor Conte acknowledged the propriety of adequate fees in common fund cases to encourage lawyers to prosecute such cases:

> [C]ourts have been careful to award a fully compensable reasonable fee based on the underlying economic inducement for class action lawyers to pursue potentially expensive or complex common fund class litigation. These lawyers assume the risk of no compensation unless they successfully confer common fund benefits on the class, based on their reasonable expectation that they will share in the recovery in a fair proportion, in contrast to receiving a fee based initially on time-expended criteria that fail[ed] to give the ***results obtained*** factor primary consideration.

1 Alba Conte, *Attorney Fee Awards* §1.09, at 16 (2d ed. 1993) (emphasis in original).

awarded by the Court.[10]

## I.   <u>The Time and Labor Involved</u>

  While unnecessary to the Court's determination, some courts have used the

lodestar approach as a check on the reasonableness of the requested fee. Here, the lodestar cross-

check demonstrates that a fee of $27 million or approximately 21.2% is more than fair. *See Byrd*

*v. Chadwick*, 956 S.W. 2d at 388 ("The court may also check the fairness of the proposed award

by comparing it to the amount to which counsel would be entitled if their fee were figured on an

hourly basis."); *In re Charter Communications, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 14772, at

(E.D. Mo. June 30, 2005) (a 20% fee equating to a multiplier of 5.61 under a lodestar analysis

was "within the range of multipliers found reasonable for cross-check purposes").

  In this case the total lodestar to date is approximately $12,246,047.65. Johnson

Decl., ¶ 5.[11] Counsel seek a fee of $27 million or approximately 21.2%. On a lodestar basis, the

---

[10] The Barnes Objector argues that in so-called "megafund" cases, which the Objector seems to identify as cases with a value greater than $100 million, the percentage applied should decline with the size of the recovery. Capping a percentage recovery at an arbitrary level, or reducing it as the size of the settlement increases, defeats the purpose of a percentage-based recovery, which is, *inter alia*, to compensate counsel in line with the results achieved. Courts have frequently approved fee awards at percentages higher than counsel seek here even in "megafund" cases. In fact, fee awards from 25% to 30% where cases are settled for amounts between $100 million and $200 million are, according to the Third Circuit, "fairly standard." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 296, 303 (3d Cir. 2005) (noting that the district court's analysis in this regard was "exemplary"). <u>See</u>, <u>e.g.</u>, *Vizcaino*, 290 F.3d at 1050-51 (affirming an award of 28% of an approximately $97 million settlement); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532, at *1-2 (E.D. Pa. Jun 2, 2004) (awarding 30% of $202 million settlement); *In re Relafen Antitrust Litig.*, 01 Civ. 12239 (WGY), 2004 U.S. Dist. LEXIS 28801, at *20-21 (D. Mass. Apr. 9, 2004) (awarding a 33⅓% fee of a $175 million settlement); *In re Monosodium Glutamate Antitrust Litig.*, No. 00-MDL-1328, 2003 U.S. Dist. LEXIS 1970 at *8 (D. Minn. Feb. 6, 2003) (awarding 30% of a $81.4 million settlement); *In Re Cardizem CD Antitrust Litig.*, MDL. No. 1278 (NGE), (E.D. Mich. Nov. 26, 2002) (awarding 30% of a $110 million settlement) (McFarlane Decl. Ex. C); *In re Vitamins Antitrust Litig.*, No. 99-197, MDL 1285, 2001 U.S. Dist. LEXIS 25067, at *68 (D.D.C. July 16, 2001) (awarding approximately 34% of a $360 million settlement); *In re Old CCA Securities Litig.*, 99 Civ. 0458, 2001 U.S. Dist. LEXIS 21942, at *3-4 (M.D. Tenn. Feb. 9, 2001) (awarding 30% of a $111 million settlement); *In re Aetna Inc. Sec. Litig.*, MDL. No. 1219, 2001 U.S. Dist. LEXIS 68, at *49-50 (E.D. Pa. Jan. 4, 2001) (awarding 29.5% of a $83 million settlement); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 197-98 (E.D. Pa. 2000) (awarding 30% of a gross $111 million fund).

[11] The lodestar is the arithmetic calculation of the number of hours spent on the matter multiplied by the individual's hourly billing rate.

requested fee represents a 2.2 multiplier of counsel's lodestar.  In lodestar/multiplier jurisprudence, multipliers in excess of this amount are commonly awarded, and those cases do not appear to have been riskier or to represent a better result than the one achieved here.[12] Therefore, the requested fee is very reasonable in light of the time and labor invested in this matter.

Moreover, Plaintiff's Counsel should not be penalized because they obtained a settlement without needlessly running up their lodestar.  The lodestar could have been much higher without any additional benefit for the Class had the parties not worked cooperatively to resolve the case when they did.

The Barnes Objection, the Bowser Objection, and the Kern Objection ask the court to use the lodestar as a ceiling on the fees awarded.  However, if the lodestar is used to artificially cap the level of fees awarded, it simply serves to defeat the purposes of utilizing the percentage method which is recognized as a means to fully incentivize counsel to maximize the relief obtained for the Class, rather than accept a settlement that pays their lodestar.  *See, e.g.,* "Exploding The Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers," 155 U. Pa. L. Rev. 103, 140-41 (2006).  Accordingly, a lodestar "cross-check" must not be applied mechanistically.

Further, the fee sought here is in fact reasonable as measured against counsel's lodestar.  As set forth in the Johnson Decl., counsel have devoted over 28,504 hours, totaling $12,246,047.65 in fees, to achieving the result obtained in this case, without receiving any compensation along the way, or indeed, even any guarantee that compensation would ever be paid.  Given the extreme level of risk in this case, a multiplier of 2.2 is amply justified.  *Cf. Rite Aid, supra,* 396 F.3d at 305 (reasonableness of 4.07 multiplier); *In re NASDAQ Market-Makers*

---

[12] *See Cozgrove v. Sullivan,* 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (awarding fee equal to multiplier of 8.74); *Weiss v. Mercedes-Benz of N. Am.,* 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee equal to multiplier of 9.3 times hourly rate); *In re Cendant Corp. PRIDES Litig.,* 51 F. Supp. 2d 537 (D.N.J. 1999) (5.28 multiplier); *Di Giacomo v. Plains All Am. Pipeline,* No. Civ. A. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Fla. Dec. 19, 2001) (approving fee representing 5.3 multiplier).

*Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving multiplier of 3.97 in mega fund case; and observing that "in recent years multipliers of between 3 and 4.5 have become common").

## V.   **THE CLASS'S REACTION TO THE SETTLEMENT**

A summary notice of the settlement was published in *Business Wire* on April 13, 2007, April 20, 2007, and April 27, 2007, as well as on Edward Jones' website on March 22, 2007, and again on July 25, 2007, and individual notices of settlement were mailed to over 4.9 million Members of the Class.[13]  The notice advised Class Members of this settlement, Plaintiffs' Counsel's proposed fee of up to 30% of the settlement of $127.5 million and expense request, and of their right to object thereto.[14]  Only a miniscule number of objections were received and four briefs were filed by a total of thirteen people:  1) Shirley Barnes (the "Barnes Objection"); 2) Herbert Wayne Laye, Luise Gilford Laye, David Stokes and Sandra Stokes (the "Laye Objection"); 3) Margot L. Kern and Denise Slomovitz (the "Kern Objection"), and 4) Rebecca Diederich, Mark Hill, Janine Bowser, Ryan Bowser, Alyssa Bowser, and Colton Bowser (the "Bowser Objection").

The briefs themselves appear to have been in large part copied from one another or to have relied on earlier briefs filed elsewhere because there are paragraphs in each brief that are identical to one another.  Despite the apparent coordination by these professional objectors,[15] these lawyers were able to find just thirteen people, out of nearly five million class members who received individual notice of the settlement, to object.  That is, less than 3/10,000ths of one percent of the class have objected to the settlement.  The paucity of objections is extraordinary, and shows an overwhelming majority of the class supports this settlement.  *Cf. In re Rite Aid*

---

[13] *See* Joint Decl., ¶ 13.

[14] The deadline for objections to be filed by class members receiving the initial notice was June 11, 2007. The second notice, mailed to class members Edward Jones inadvertently excluded from the first mailing, extended the deadline to file objections for those class members to September 25, 2007.

[15] These lawyers travel the country filing objections to class action settlements and recruiting potential objectors through aggressive Internet advertising.

*Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (observing that only two objections out of class of 300,000 was a "rare phenomenon" and agreeing with district court that this fact weighed in favor of approving fee request.)

The main argument made by these serial objecting law firms with respect to attorneys fees is that the fee requested is excessive. While acknowledging that 25%-30% is an appropriate percentage award for class actions, they argue that the percentage should be reduced from that benchmark to a smaller percentage. In so doing, they cite as relevant authority the billion-dollar settlement reached in *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465 (S.D.N.Y. 1998). There the court approved attorneys fees of $143 million, which constituted 14% of the value of the settlement. *Id.* at 488. It is worth noting that *NASDAQ Market-Makers*, which approved an award nearly five times the fee sought here, involved a case that took the same amount of time as this one to resolve and a class just one-fifth the size of that here. Moreover, that the court did not award the benchmark 25% fee in *NASDAQ Market-Makers* – which there would have yielded a fee of $250 million – cannot be said to mean that counsel in this case are not entitled to a $27 million fee.[16]

As even the cases cited by the Objectors note, there is no rule that the percentage awarded *should* decline as the size of the case increases, only that the percentage sometimes *does* decline. Indeed, the "mechanical or formulaic application" of a particular method to calculate fees is held to be an abuse of discretion. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) ("there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund…We have generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees"); *Fischel v. Equitable Life Assurance Society*, 307 F.3d 997, 1007 (9th Cir. 2002) (noting that mechanical or formulaic application of a percentage or lodestar method can be an abuse of

---

[16] Another "mega-fund" case cited by the Objectors, *In Re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522 (D. Nev. 1987), similarly is in no way comparable to the settlement at issue here. The fee application considered there concerned a mass tort, described as the second largest life loss hotel fire in the history of the United States, and involved claims of just 1,084 plaintiff interests and a global settlement valued at over $2 *billion* dollars.

discretion where it yields an unreasonable result). *Rite-Aid* is particularly instructive, because the size of the settlement there ($126.6 million) was nearly identical to the size of the settlement here. The court approved a 25% fee, finding it within the "fairly standard" 25-30% range for class actions involving settlements between $100 and $200 million. *Id.* at 298.

Courts have appropriately criticized the application of a declining percentage because it:

> . . . gives rise to an attorney incentive problem by creating declining marginal returns to effort for counsel. If counsel's opportunity costs begin to exceed the economic benefit to counsel of continuing to litigate, counsel may be more likely to settle the case and exit the litigation rather than prolonging the litigation and pushing for a higher recovery for the class, even if the added effort would be in plaintiffs' best interest. Again, this method can create an incentive to settle quickly and cheaply, when the returns to effort are highest, rather than investing additional time and maximizing plaintiffs' recovery.

*In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000). The Court should refrain from creating an economic incentive for quick and dirty class settlements by penalizing counsel who diligently pursue high value settlements on behalf of their clients.

The Bowser and Kern Objectors argue the Court should wait to award a portion of the requested fee until after existing customer class members have the opportunity to redeem the vouchers. The cases cited by the Objectors for this proposition, however, do not support such an approach here. The Objectors rely primarily on *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 378 (D. Mass. 1997). These Objectors state that the *Duhaime* court withheld 40% of the attorney fee so that the court could review the quality of representation. In actuality, the court withheld a portion of the fee because the settlement provided the class members with two options and could not value the settlement until class members had made their choice. "The difficulty here is that the actual value of the settlement is presently unknown. It will not be known until class members have chosen and received either General Policy Relief or an award through the ADR process." *Id.* at 378. Here, the value is known.

In *Excess Value Insurance Litigation*, Case No. M-21084 (MDL No. 1339)

(S.D.N.Y. Nov. 2, 2005), the class received vouchers of four types, one automatic with no claim form, and three types that required claim forms (one of which also required an affidavit), which were redeemable within 180 days of issue date. There were 26 Objectors out of class of 2.6 million that were mailed notices (described as extremely small by the court). The court noted that the voucher program "offered real value" to the Class members and appeared to be the best result that class counsel could negotiate. The court did not, as the Objectors would suggest, defer the attorney fee award. Rather it simply referred the fee issue to the magistrate judge.

*In Re Prudential*, 962 F. Supp. 450 (D. N.J. 1997), simply does not support what the Objector says it does. The district court certified a class and the circuit reversed. The case did not address attorneys fees or settlement approval. *See also In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 343, F. Supp.2d 838 (W.D. Mo. 2004) (fees delayed until after completion of post-settlement *discovery*, which was a peculiar feature of that unusual case). Finally, Objectors' citation to *In Re PNC Financial Svcs. Group*, Case No. 2:02-cv-002710DSC (W.D. Pa. April 17, 2007), is grossly misleading. There, the court awarded plaintiff's counsel 28% of the settlement fund plus expenses with interest. Only $100,000 of the fees were withheld until the Court entered an order approving distribution. The fees were *not* withheld until the payout was completed nor were they contingent on claims made.

The arguments made by the Objectors should be overruled. As demonstrated above, the percentage of the common fund sought here is in line with percentage fee awards routinely approved throughout the United States. Further, the complexity and risks associated with the cases, together with the outstanding result achieved, justifies an award of up 30%, but Plaintiffs' Counsel are requesting a fee equal to only 21.2%. Given this complexity, the number of attorneys involved in the litigation is perfectly appropriate. The combined expertise, experience and knowledge of the counsel involved were fundamental in achieving this exceptional result for Class.

## VI. CO-LEAD COUNSELS' EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED FOR THE CLASS

Plaintiffs' Counsel request reimbursement for expenses incurred in prosecuting this litigation on behalf of the Class in an aggregate amount of $712,000.00. The expenses actually incurred are itemized in the declarations of counsel submitted herewith. *See* Johnson Decl., Exhibit A.[17]

The appropriate analysis in making a determination whether particular costs are compensable is whether the costs are of the type typically billed by attorneys to paying clients in the marketplace. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that 'would normally be charged to a fee paying client.'") (citation omitted). *See also Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995) (expenses recoverable if customary to bill clients for them); *Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42*, 8 F.3d 722, 725-26 (10th Cir. 1993) (expenses reimbursable if normally billed to client).

In *Brown v. Pro Football*, 839 F. Supp. 905 (D.D.C. 1993), the court addressed whether plaintiffs who created a common fund were entitled to reimbursement of expenses. Relying on *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), the court held that counsel's expenses were appropriately compensable:

> Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee.

*Brown*, 839 F. Supp. at 916. The categories of expenses for which Plaintiff's counsel seek reimbursement here are categories normally charged to hourly clients and, therefore, should be reimbursed out of the common fund.

In sum, the award of $712,000.00 in expenses from the fund created by Plaintiffs' Counsel is appropriate and should be approved by the Court.

---

[17] Actual expenses are $738,335.85. Counsel are seeking only $712,000 as class members were advised in the notice of settlement that costs were estimated not to exceed that amount.

## VII.   PAYMENT OF FEES AND EXPENSES DOES NOT IMPACT PROCEEDS TO THE CLASS

The payment or non-payment of the requested fees and expenses will not impact the proceeds received by the Class.  Any residual left after paying fees and expenses will first be paid to defendants to cover notice and administration costs up to a maximum of $6 million.  If any amounts remain after payment of these costs, such remainder will revert to *cy pres*.  The settlement was structured thusly to assure the value of the settlement (*i.e.* that Edward Jones would be obligated to fund the full amount of the settlement) and to assure that current and former Class members were treated equally.  To achieve equity between current customers and former customers, the cash component was designated for payment to formers, but in a fixed amount that equals (discounted to current value) the value of the credits being given to current customers.  In this way all Class members are assured of a fair and equitable recovery.  A consequence of this allocation is that a reduction in attorney fees will not cause the payment to the Class to increase.

The 3.6 million current client Class members will receive $20.23 in credits usable over the next three years and the 1.3 million former client Class members will each receive a check for $18.33, meaning Edward Jones will send $24 million in checks to former customers and credits of $72.5 million to its current customer Class members.  If awarded, Plaintiffs' Counsel's request of $27 million in fees will be paid without impacting these payouts, just as a higher or lower award will not impact the substantial recovery by the Class.

## VIII.   CONCLUSION

The settlement of these actions for $127.5 million is an excellent result, and is the culmination of the diligent work by Plaintiffs' Counsel in each of the actions.  For their efforts, counsel request that the Court approve the fee and expense application and enter an order awarding them fees of $27 million – approximately 21.2% of the Settlement Fund – plus expenses in the amount of $712,000.00.

Dated:  October 9, 2007

Respectfully submitted,
**BLITZ, BARDGETT & DEUTSCH, L.C.**

_____
Robert D. Blitz, #2647
Christopher O. Bauman, #499786
120 South Central, Suite 1650
St. Louis, Missouri 63105
Telephone:  (314) 863-1500
Facsimile:  (314) 863-1877

***Co-Lead Counsel for the Enriquez Plaintiffs***

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
James Tullman
Julia J. Sun
551 Fifth Avenue
New York, New York 10176
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
James Henry Glavin, IV
6 East 45th Street
New York, New York 10017
Telephone:  (212) 687-7230
Facsimile:  (212) 490-2022

**MILBERG WEISS LLP**
Jerome M. Congress
One Pennsylvania Plaza
New York, New York 10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

***Co-Lead Counsel for the Spahn Plaintiffs***

**SAUERWEIN & BLANCHARD P.C.**
Martin W. Blanchard
147 N. Meramec Avenue, 2nd Floor
St. Louis, Missouri 63105
Telephone:  (314) 863-9100
Facsimile:  (314) 863-9101

**LAW OFFICES OF LEONARD KOMEN, P.C.**
Leonard Komen
7733 Forsyth Boulevard, Suite 300
Clayton, Missouri 63105
Telephone:  (314) 651-1611
Facsimile:  (314)863-9196

*Co-Liaison Counsel for the Spahn Plaintiffs*

**STANLEY, MANDEL & IOLA, L.L.P.**
Roger L. Mandel
Matthew J. Zevin
550 West C Street, Suite 1600
San Diego, California 92101
Telephone: (619) 235-5306
Facsimile: (815) 377-8419

**HULETT, HARPER, STEWART, L.L.P.**
Kirk B. Hulett
550 West C Street, Suite 1770
San Diego, California 92101
Telephone: (619) 338-1133
Facsimile: (619) 338-1139

**GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP**
Wayne T. Lamprey
Keith E. Johnson
505 Sansome Street, Suite 900
San Francisco, California 94111
Telephone: (415) 392-7900
Facsimile: (415) 398-4321

*Co-Lead Counsel for the Enriquez Plaintiffs*

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Peter A. Binkow
Michael Goldberg
Marc L. Godino
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt
Garrett Blanchfield
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
Telephone: (651)287-2100
Facsimile: (651) 287-2103

**MURRAY FRANK & SAILER LLP**
Briand Murray
Jacqueline Sailer
275 Madison Avenue
New York, New York 10016-1101
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

**LAW OFFICES OF BRIAN BARRY**
Brian J. Barry
1801 Avenue of the Stars, Suite 308
Los Angeles, California 90067
Telephone: (310) 788-0831
Facsimile: (310) 788-0841

*Co-Lead Counsel for the Bressler Plaintiffs*